IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RACHID CHAKIR; DAVID | ) | |
| GRAHAM; CHRISTOPHER HARRISON; | ) | |
| TANYA KALIS; CHARLENE REED; | ) | |
| ALBERT NGUYEN; and IKENNA | ) | |
| OFOMA, on Behalf of Themselves and | ) | |
| All Other Plaintiffs Similarly Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cstase No. 4:10-CV-2850 |
| | ) | |
| BA RESEARCH INTERNATIONAL, L.P., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiffs are seven former employees of Defendant BA Research International,

L.P. ("BA Research" or the "Company") who apparently subscribe to the belief espoused

by Gordon Gekko in the movie *Wall Street* that "greed, for lack of a better word, is

good."  As Extraction Chemists working for BA Research, Plaintiffs were paid a

guaranteed salary and performed sophisticated bioanalytical lab work that made them

"exempt" from overtime pay under the Fair Labor Standards Act ("FLSA").  Because

Plaintiffs were salaried, exempt employees, they could have been required by BA

Research to work more than 40 hours per week with no additional pay beyond their

normal base salary.  However, BA Research agreed to a proposal from Plaintiff

Christopher Harrison to pay the Extraction Chemists additional money when they

performed additional extraction work beyond the work that might be performed in a normal eight-hour workday.

Despite having played a role in creating this compensation system, which was voluntary on the part of the chemists and which in some cases doubled or tripled their base salaries, Plaintiffs have filed this FLSA lawsuit hoping to receive a windfall in the form of overtime pay on top of the additional compensation that was already paid to them by BA Research.  As set forth in more detail below, Plaintiffs' FLSA overtime claims should be dismissed for at least three reasons.  First, Plaintiffs' overtime claims fail because it is undisputed that Plaintiffs were exempt from the FLSA's overtime pay requirements by virtue of the statutory exemption for learned professionals.  Second, Plaintiff Christopher Harrison's FLSA claims for 2007 and 2009 must be dismissed because he was covered by the FLSA exemption for highly compensated employees earning more than $100,000 in total annual compensation.  Finally, Plaintiffs' FLSA claims fail as a matter of law because they cannot meet their burden to show the amount and extent of their alleged uncompensated overtime, even as a matter of just and reasonable inference.  Indeed, Plaintiffs admit that they do not know how many hours they actually worked in any given week and are not aware of any documents or records that would permit them to estimate the amount of overtime owed to them.  Accordingly, for the reasons set forth below, BA Research respectfully requests that its Motion for Summary Judgment be granted and that Plaintiffs' claims be dismissed with prejudice.

II.     STATEMENT OF FACTS

A.     Overview of BA Research's Business Operations

BA Research is a leading provider of bioanalytical services to the pharmaceutical industry.  (Antes Decl. at ¶ 6)[1]  Stated simply, BA Research develops customized methods for analyzing the amount of pharmaceutical compounds that are present in various biological fluids (e.g., blood, plasma, etc.) at various points in time after the subject drug is administered to a patient.  (Antes Decl. at ¶ 6; Graham Dep. at 26; Harrison Dep. at 36; Kalis Dep. at 15-16; Ofoma Dep. at 16)[2]  The results of BA Research's bioanalysis are used by the Company's pharmaceutical clients in submitting both new drug applications and bioequivalence applications for generic drugs coming to market for approval by the U.S. Food & Drug Administration (the "FDA") and other agencies.  (Antes Decl. at ¶ 6; Graham Dep. at 26-27; Harrison Dep. at 37; Kalis Dep. at 13; Ofoma Dep. at 16-17; Reed Dep. at 40)

Because BA Research's bioanalysis directly impacts the regulatory approval (or disapproval) of bioequivalence and new drug applications, the Company must comply with various FDA regulations regarding laboratory and documentation practices and procedures.  (Antes Decl. at ¶ 8; Graham Dep. at 21, 26-27; Harrison Dep. at 37-38; Kalis Dep. at 12-13, 16; Ofoma Dep. at 15-17; Reed Dep. at 38-39)  Among other requirements, the FDA's Good Laboratory Practices regulations ("GLPs") require that

---

[1]     The Declaration of Ronald E. Antes II is submitted to the Court at Tab A of the Company's Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment (the "Appendix") and is cited as the "Antes Decl." throughout this Memorandum of Law.

[2]     Relevant excerpts from the depositions of the seven Plaintiffs are contained at Tabs C through I of the Appendix and are cited as "[Plaintff] Dep." throughout this Memorandum of Law.

BA Research develop standard operating procedures for the receipt, identification, storage, handling, mixing, and method of sampling of the human biological samples that BA Research receives and analyzes.  (Antes Decl. at ¶ 8)  The GLPs also establish strict requirements regarding recordkeeping and documentation of test results, with the most critical requirement being that test results be documented contemporaneously at the time that the procedures are actually being performed.  (Antes Decl. at ¶ 8)

B.       BA Research's Facility in Houston, Texas and the Role of Extraction Chemists

BA Research operates a facility in Houston, Texas, which currently employs approximately 67 employees.  (Antes Decl. at ¶ 5)  Of those 67 employees, 11 work as Extraction Chemists in the Houston laboratory.  (Antes Decl. at ¶ 5)  The Extraction Chemists are the group of employees that conducts the actual bioanalysis of the biological samples in the laboratory.[3]  (Antes Decl. at ¶ 9)  The seven Plaintiffs in this case all worked as Extraction Chemists for BA Research in the Houston lab until 2009. (Antes Decl. at ¶ 5; Chakir Dep. at 15-17; Graham Dep. at 17; Harrison Dep. at 22; Kalis Dep. at 9; Nguyen Dep. at 14; Ofoma Dep. at 11; Reed Dep. at 14)

The bioanalytical chemistry conducted by BA Research's Extraction Chemists is among the most complex and sophisticated chemistry work being done in the pharmaceutical industry.  (Antes Decl. at ¶ 11; Graham Dep. at 15)  In fact, chemists performing job duties similar to those of the Company's Extraction Chemists are an extremely select group, as they make up fewer than 1% of all chemists working in the

---

[3]       In addition to the principal job duties of an Extraction Chemist described in more detail below, some Extraction Chemists also have input into the R&D aspects of the Company's business and provide input into the development of the Company's testing protocols, as well as training for other chemists.  (Graham Dep. at 86, 91; Harrison Dep. at 53-55)

pharmaceutical industry.  (Antes Decl. at ¶ 11)  Extraction Chemists must perform a series of complex extractions to analyze the manner in which extremely small amounts (in some cases less than a picogram) of a particular drug have interacted with and metabolized in a particular person's unique biological fluids.  (Antes Decl. at ¶ 11)  The extremely low concentrations of the drugs they are studying significantly increase both the complexity of the processes they must carry out and the possibility of error in the extraction process (and hence the need for a high level of skill to perform the extractions).  (Antes Decl. at ¶ 11)  Moreover, the fact that the analysis is performed on unique biological materials increases the complexity of the extraction process by introducing uncertainty about how unknown and unpredictable characteristics of the biological sample may interact with the materials used during the extraction process or otherwise impact the results of the study.  (Antes Decl. at ¶ 11)

C.      Hiring Requirements for Extraction Chemists and Initial Training

        In order to work as an Extraction Chemist at BA Research, a chemist must possess a Bachelors of Science degree in biological sciences (e.g., biology or chemistry).  (Antes Decl. at ¶ 10)  This requirement is essential to an Extraction Chemist's ability to perform the job because without a sophisticated understanding of the nature of chemical reactions, exposure to scientific methods and analysis, and hands-on experience working with laboratory equipment in a lab environment, an Extraction Chemist would not be able to make the key judgments and decisions or perform the chemical analysis necessary to complete the extraction process.  (Antes Decl. at ¶ 10)  Consistent with this hiring requirement, all seven Plaintiffs possess B.S. degrees in one or more of the biological

sciences.  (Chakir Dep. at 8-9; Graham Dep. at 10; Harrison Dep. at 11; Kalis Dep. at 6; Nguyen Dep. at 11; Ofoma Dep. at 8; Reed Dep. at 7-8)

After BA Research hires an Extraction Chemist, the Company conducts extensive training of the new chemist to make sure that he or she is aware of and conducts his or her work in compliance with the FDA's GLPs.  (Antes Decl. at ¶ 9; Graham Dep. at 24-26; Harrison Dep. at 32-34; Kalis Dep. at 56-57; Nguyen Dep. at 114-15; Ofoma Dep. at 19-20)  In addition to this new-hire training, BA Research also conducts annual follow-up training with the Extraction Chemists on the GLPs.  (Antes Decl. at ¶ 9)

D.      Description of Extraction Chemists' Job Duties at BA Research

Once an Extraction Chemist is assigned to work on a particular drug study, there are essentially four major steps to be completed: (1) pre-study activities; (2) extraction; (3) injection; and (4) processing.  (Antes Decl. at ¶ 12)  The first step is for the Extraction Chemist to carry out a number of pre-study activities, including review and analysis of the reference materials for the study, preparation of the quality control samples, and establishment of what is referred to as a "standard curve" that will form the basis of the bioanalysis.  (Antes Decl. at ¶ 13; Harrison Dep. at 45-48)  This pre-study activity work is critically important to BA Research's bioanalytical operations because, without a proper set of quality control samples and a standard curve, there is no reliable benchmark against which to measure the actual study subject samples.  (Antes Decl. at ¶ 13)

The second step in the process is for the Extraction Chemist to receive the actual biological samples to be analyzed from the Sample Handling Group and proceed to "extract" the samples consistent with the study guidelines.  (Antes Decl. at ¶ 14; Graham Dep. at 35-37; Harrison Dep. at 46; Kalis Dep. at 24; Nguyen Dep. at 41)  This extraction

- 6 -

step basically involves utilizing one of the following three different chemical extraction procedures to separate the pharmaceutical compound from the particular biological sample so that it can be analyzed by a mass spectrometer: (1) protein precipitation; (2) liquid-liquid extraction; or (3) solid phase extraction.  (Antes Decl. at ¶ 14; Graham Dep. at 38; Harrison Dep. at 47-48; Nguyen Dep. at 27-28)

Protein precipitation involves adding a solvent to the biological sample to form a precipitation, centrifuging the sample, and then injecting a supernatant.  (Antes Decl. at ¶ 14; Chakir Dep. at 38; Harrison Dep. at 49-50)  A liquid-liquid extraction is significantly more complex than a protein precipitation, as it requires an Extraction Chemist to separate the compounds in the biological sample based on their relative solubilities into two different liquids, usually water and a solvent.  (Antes Decl. at ¶ 14; Harrison Dep. at 57-59)  Finally, a solid phase extraction is the most complex extraction technique, as it involves using a centrifuge to force the biological sample through a syringe-shaped cartridge, which filters out and isolates the substances to be analyzed.  (Antes Decl. at ¶ 14; Harrison Dep. at 62-63)  Regardless of which type of extraction process is used, each individual extraction performed by a chemist is unique, due in large part to the variability of the human biological samples and the pharmaceutical compounds that are being analyzed.  (Antes Decl. at ¶ 14; Graham Dep. at 38-39)

The third step in the process is to utilize one of two different liquid chromatographic techniques to identify and quantify the individual components of the sample.  (Antes Decl. at ¶ 15)  The two chromatographic techniques are (1) high-performance liquid chromatography ("HPLC"); and (2) liquid chromatography/tandem mass spectrometry ("LC-MS/MS").  (Antes Decl. at ¶ 15; Chakir Dep. at 88; Harrison

Dep. 40-41)  During the time that Plaintiffs worked at BA Research, approximately 20% of the Extraction Chemists were trained on how to operate and calibrate these sophisticated chromatography mass spectrometer machines (which can cost upwards of $500,000 or more) and to "inject" their samples for analysis.  (Antes Decl. at ¶ 15; Chakir Dep. at 88; Graham Dep. at 49-51; Harrison Dep. at 68-69)  Extraction Chemists who injected their own runs were required to use their education, training, experience and scientific judgment to prepare the chromatography mass spectrometer machines, identify potential problems through analysis of chromatograms and, if any problems were identified, use their troubleshooting skills to analyze and identify the source of the problem.  (Antes Decl. at ¶ 15; Chakir Dep. 26; Graham Dep. at 50; Harrison Dep. at 155-56; Reed Dep. at 50-51)

The fourth and final step in the extraction procedure is for the Extraction Chemist to obtain the chromatography results and then process those results using a software program referred to as the "Analyst" system.  (Antes Decl. at ¶ 16; Graham Dep. at 30-32; Harrison Dep. at 72; Ofoma Dep. at 30)  Before processing the extraction run, the Extraction Chemist must review the chromatography results to make sure that the run was completed and injected properly.  (Antes Decl. at ¶ 16; Chakir Dep. at 83-84; Graham Dep. at 30; Ofoma Dep. at 30)  Next, the Extraction Chemist must isolate and identify the particular chromatographic "peaks" that correspond to the pharmaceutical compound being analyzed.  (Antes Decl. at ¶ 16; Graham Dep. at 30-31; Harrison Dep. at 72; Kalis Dep. at 20-21; Nguyen Dep. at 40-41)  After identifying the proper peaks, the Extraction Chemist must determine whether the peaks are properly shaped and then filter out any extraneous "noise" that may be present in the chromatography.  (Antes Decl. at

¶ 16; Chakir Dep. at 83-84; Harrison Dep. at 72; Kalis Dep. at 20-21; Nguyen Dep. at 40-41)  That process involves using scientific judgment, analysis, and discretion to adjust the threshold and baseline parameters to ensure proper peak shapes for analysis.  (Antes Decl. at ¶ 16; Graham Dep. at 30-32; Harrison Dep. at 72)  Once the chromatography has been analyzed and processed, the results of the bioanalysis are imported into a system called "Watson," where the linear regression and back calculation of subjects is performed to be included in the final report prepared for the study.  (Antes Decl. at ¶ 16; Chakir Dep. at 83; Graham Dep. at 33-34; Harrison Dep. at 72; Ofoma Dep. at 31-32)

E.    Compensation Practices Applicable to BA Research's Extraction Chemists

As Extraction Chemists, Plaintiffs were paid on a salary basis and received their paychecks on a semi-monthly basis (i.e., twice per month).  (Stoddart Decl. at ¶ 4; Chakir Dep. at 17-18, 25-27 & Ex.1; Graham Dep. at 17-20, 78-79 & Ex. 2; Harrison Dep. at 112, 131-35 & Ex. 5, 6; Kalis Dep. at 9, 38 & Ex. 2; Nguyen Dep. at 14; Ofoma Dep. at 14, 90-91; Reed Dep. at 14-15)[4]  They receive a guaranteed, fixed salary each pay period, regardless of the number of hours actually worked.  (Stoddart Decl. at ¶ 4; Graham Dep. at 19-20; Ofoma Dep. at 90-91)  Though their typical workweek was Monday through Friday, 8:00 a.m. or 8:30 a.m. to 5:00 p.m. or 5:30 p.m., with an hour break for lunch, their salary was not subject to being docked even if they worked less than 40 hours in a

---

[4]    The Declaration of Kim Stoddart is submitted to the Court at Tab B of the Appendix and is cited as the "Stoddart Decl." throughout this Memorandum of Law.

LEGAL02/32568336v6

particular week.[5]  (Stoddart Decl. at ¶ 4; Kalis Dep. at 10; Ofoma Dep. at 14, 90-91)

Because the Extraction Chemists were paid on a salary basis and their job duties fell

squarely within the FLSA's professional exemption, they were treated as exempt

employees and did not receive overtime pursuant to the FLSA.  (Stoddart Decl. at ¶ 4)

In approximately 2003, one of the chemists in the lab, Plaintiff Harrison,

approached the prior owner of BA Research, Paul Likhari, and expressed an interest in

earning additional money beyond his base salary for performing additional extraction

procedures.  (Stoddart Decl. at ¶ 8; Harrison Dep. at 119-21; Nguyen Dep. at 66-67; Reed

Dep. at 18-19)  After discussions between Harrison and the Company, it was agreed that

Extraction Chemists who completed more than two protein precipitations or one liquid-

to-liquid or solid phase extraction in a given day would earn an additional four hours of

compensation for each additional extraction.[6]  (Stoddart Decl. at ¶ 6; Chakir Dep. at 27-

28; Graham Dep. at 76; Harrison Dep. at 121; Kalis Dep. at 10; Nguyen Dep. at 68;

Ofoma Dep. at 91-92; Reed Dep. at 28)  Chemists filled out timesheets keeping track of

their additional runs for which they would be paid.  (Stoddart Decl. at ¶ 7; Chakir Dep. at

57; Graham Dep. at 59-60; Kalis Dep. 31-32; Ofoma Dep. at 56-57; Reed Dep. at 65-66)

The process for working and receiving additional compensation for extra runs was

voluntary, and Extraction Chemists were not required to perform additional runs beyond

---

[5]      Indeed, there is no evidence that any Plaintiff ever received anything less than his
or her full salary during any pay period, as Plaintiffs' counsel conceded on the record.
(Chakir Dep. at 78-80; Graham Dep. at 81-82; Harrison Dep. at 138-139; Kalis Dep. at
44; Nguyen Dep. at 70; Ofoma Dep. at 90-91; Reed Dep. at 82-83)

[6]      Although Extraction Chemists are paid on a salary basis, the Company calculates
an hourly rate for purposes of determining their premium pay by dividing their annual
salary by 2080 hours of work (which is 40 hours/week X 52 weeks).  (Stoddart Decl. at
¶ 6; Chakir Dep. at 28-29; Nguyen Dep. at 69)

their normal workday.  (Stoddart Decl. at ¶ 8; Graham Dep. at 73-74; Kalis Dep. at 60;

Nguyen Dep. at 61; Reed Dep. at 80-81)  Some Extraction Chemists chose not to take

advantage of the additional earning opportunity and continued to work their normal work

schedule for their normal salary.  (Stoddart Decl. at ¶ 8; Graham Dep. at 74; Kalis Dep. at

60; Reed Dep. at 81)  However, other Extraction Chemists, including all seven Plaintiffs,

took full advantage of this additional compensation arrangement and dramatically

increased their compensation by virtue of the fact that they were able to perform multiple

extraction runs at the same time.  (Stoddart Decl. at ¶ 8; Chakir Dep. at 41; Harrison Dep.

at 64-65; Kalis Dep. at 24; Nguyen Dep. at 90-91; Reed Dep. at 57-58)  For example,

Plaintiff Harrison performed as many as five runs at the same time and typically worked

on three or four runs simultaneously.  (Harrison Dep. at 64-65)  Plaintiff Nguyen also

performed as many as five runs at a time.  (Nguyen Dep. at 90-91)  Thus, an Extraction

Chemist who worked a 13-hour day might end up getting paid the equivalent of 28 or

more hours for that day.  (Harrison Dep. at 96-97; Nguyen Dep. at 51-53)  In fact, one of

the Plaintiffs – Christopher Harrison – saw his compensation increase from an annual

salary of $30,000 in 2002 to total compensation of more than $100,000 in 2007.

(Harrison Dep. at 110, 132-35 & Ex. 4, 6)

F.     The Termination of Plaintiffs' Employment with BA Research in 2009

          In April 2009, BA Research received a letter from a former employee alleging

that chemists in the Houston laboratory were manipulating and falsifying data associated

with the samples being analyzed by the Company.  (Antes Decl. at ¶ 22; Nguyen Dep. at

99-100)  BA Research conducted an immediate and thorough investigation into the lab

practices and, after several months of investigating the allegations, the Company was

unable to confirm any fraudulent manipulation of study data that impacted the accuracy or integrity of the studies performed by the Company.  (Antes Decl. at ¶ 23)  However, BA Research did uncover hundreds of discrepancies in the study documentation where Extraction Chemists had recorded performing extraction runs on dates and times when the Company's security access logs and log-on/log-off data from various computer systems indicated that they were not present in the lab.  (Antes Decl. at ¶ 23)

Because the FDA's regulations mandate contemporaneous/concurrent documentation of the study activities, BA Research self-reported the findings regarding the documentation discrepancies to the FDA.  (Antes Decl. at ¶ 24)  That self-disclosure prompted FDA to conduct an on-going investigation into the Company's lab practices and the potential impact on the accuracy of the study data reported by BA Research. (Antes Decl. at ¶ 24)  While the Company was able to establish that the improper study documentation did not impact the accuracy or integrity of the underlying study data, the FDA's investigation has cost the Company millions of dollars in investigation costs and lost client revenues.  (Antes Decl. at ¶ 24)

Based on the findings of the investigation team, the Company had no choice but to terminate seven Extraction Chemists who had been found to have engaged in the improper documentation and recording of the study data.  (Antes Decl. at ¶ 26)  Those seven Extraction Chemists included Plaintiffs Chakir, Graham, Kalis, Nguyen, Ofoma, and Reed, along with a seventh Extraction Chemist who is not part of this lawsuit.

(Antes Decl. at ¶ 26)  Plaintiff Harrison was not terminated in July 2009 because he had voluntarily resigned his employment in March 2009.  (Antes Decl. at ¶ 26)[7]

III.    ARGUMENT AND CITATION OF AUTHORITY

A.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and…the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions 'of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to go beyond the pleadings and submit evidence in the form of affidavits, depositions, admissions and the like, demonstrating that a genuine issue of material fact does exist.  *Id.*  A party may not defeat summary judgment by relying on "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002).

B.    Plaintiffs' Overtime Claims Fail as a Matter of Law Because They Were Covered By One or More of the FLSA's Overtime Exemptions.

Plaintiffs' overtime claims under the FLSA fail as a matter of law because they were learned professionals exempt from the FLSA's overtime requirements.

---

[7]    Plaintiffs' Amended Complaint included meritless claims for wrongful discharge based on their national origin in violation of 42 U.S.C. § 1981 and alleged retaliation in violation of the FLSA, but those claims have been dismissed.  (Dkt. Nos. 25, 39)

Additionally, Plaintiff Harrison was exempt from the FLSA's overtime requirements because he fell within the Act's exemption for highly compensated employees.

      1.     <u>Plaintiffs Were Properly Treated as Exempt Professionals</u>

The FLSA exempts employees working in a "bona fide…professional capacity" from the Act's overtime requirements. 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.0(a). The Department of Labor's regulations define an exempt professional as an employee (1) who is compensated on a salary or fee basis at a rate of not less than $455 per week; and (2) whose primary duty is the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. 29 C.F.R. § 541.300(a). As detailed below, Plaintiffs met both of these requirements during their employment with BA Research and, thus, were properly treated as exempt professionals.

      a.     <u>Plaintiffs Were Compensated on a Salary Basis</u>

The DOL regulations explain that an employee is paid on a salary basis "if the employee regularly receives each pay period…a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). The regulations also make clear that an employee is still considered to be paid on a salary basis where the employer provides additional compensation (which may be paid on any basis) on top of a guaranteed amount that meets or exceeds the regulatory minimum of $455 per week. 29 C.F.R. § 541.604(a).

Here, it is undisputed that all seven Plaintiffs received a guaranteed base salary during each semi-monthly pay period that, on a weekly basis, exceeded $455 per week. (Stoddart Decl. at ¶¶ 4-5; Chakir Dep. at 17-18, 25-27 & Ex.1; Graham Dep. at 17-20,

78-79 & Ex. 2; Harrison Dep. at 112, 131-35 & Ex. 5, 6; Kalis Dep. at 9, 38 & Ex. 2;

Nguyen Dep. at 14; Ofoma Dep. at 14, 90-91; Reed Dep. at 14-15)  Thus, it is undisputed

that Plaintiffs met the salary basis test for the professional exemption.  *See* 29 C.F.R. §

541.300(a)(1).

                    b.           <u>Plaintiffs' Primary Job Duties Were those of an Exempt Learned Professional.</u>

To qualify for the learned professional exemption, an employee must satisfy the

following three elements of the primary duty test set forth in the DOL regulations:

(1) the employee must perform work requiring advanced knowledge; (2) the advanced

knowledge must be in a field of science or learning; and (3) the advanced knowledge

must be customarily acquired by a prolonged course of specialized intellectual

instruction.  29 C.F.R. § 541.301(a).  Here, as demonstrated below, Plaintiffs'

employment as Extraction Chemists with BA Research met all three requirements.

                    i.           <u>Plaintiffs' Job Duties Required "Advanced Knowledge"</u>

The Department of Labor has explained that "work requiring advanced

knowledge" means "work which is predominantly intellectual in character, and which

includes work requiring the consistent exercise of discretion and judgment, as

distinguished from performance of routine mental, manual, mechanical or physical

work."  29 C.F.R. § 541.301(b).  Moreover, employees performing such work generally

use their "advanced knowledge to analyze, interpret or make deductions from varying

facts or circumstances."  *Id.*

Here, it is readily apparent that Plaintiffs performed "work requiring advanced

knowledge" as contemplated by the DOL's regulations.  The bioanalysis performed by

Extraction Chemists like Plaintiffs is clearly "intellectual in character" because it cannot

be performed without a B.S. degree in the biological sciences and a fundamental and thorough understanding of the nature of chemical reactions and exposure to scientific methods and analysis.  (Antes Decl. at ¶ 10; Chakir Dep. at 8-9; Graham Dep. at 10; Harrison Dep. at 11; Kalis Dep. at 6; Nguyen Dep. at 11; Ofoma Dep. at 8; Reed Dep. at 7-8).

Plaintiffs' employment as Extraction Chemists also involved the "consistent exercise of discretion and judgment" throughout the bioanalytical process.  While the extraction step of the process is guided by the specific Analytical Procedure ("AP") developed for the study, Extraction Chemists make a series of scientific judgments and discretionary decisions at every step of the extraction process.  In fact, even the most seemingly "routine" portions of the extraction process required Plaintiffs and the other Extraction Chemists to use their best scientific judgment and discretion.  (Antes Decl. at ¶¶ 18-19; Chakir Dep. at 38; Graham Dep. at 85; Harrison Dep. at 43, 50-53, 57-60, 64; Reed Dep. at 49-50)  For example, while the AP may have indicated that the frozen biological samples should be thawed, vortexed, centrifuged, evaporated, dried, or reconstituted and may have even prescribed particular periods of time for such activities, it was up to the Extraction Chemists to use their judgment and discretion to assess whether the samples were, in fact, adequately thawed, vortexed, centrifuged, dried, or evaporated before proceeding on with the extraction process, and to ensure that sample integrity was not compromised while those activities were taking place.  (Antes Decl. at ¶¶ 18-19; Chakir Dep. at 38; Harrison Dep. at 57-60)  Failure by an Extraction Chemist to display or utilize sound scientific judgment and discretion during the extraction

process could have significant consequences, as such a failure jeopardized all data generated.  (Antes Decl. at ¶¶ 18-19)

The amount of judgment and discretion exercised during the extraction process was increased exponentially by the fact that Plaintiffs usually worked on two or more extraction runs at the same time.  (Antes Decl. at ¶ 20; Chakir Dep. at 41; Harrison Dep. at 64-65; Kalis Dep. at 24; Nguyen Dep. at 90-91; Reed Dep. at 57-58).  In fact, some Plaintiffs worked on as many as five extraction runs at once.  (Harrison Dep. at 64-65; Nguyen Dep. at 90-91)  Thus, Plaintiffs had to utilize their project and time management skills to make a series of judgments and decisions about how to plan out and coordinate their work to meet the deadlines established by the particular SOPs, and to make sure that the equipment needed to perform the various steps would be available for use at the particular times required by the extraction procedure.  (Antes Decl. at ¶ 20; Graham Dep. at 84-86 & Ex. 11)  Failure to make the correct judgments in managing and overseeing the extraction process properly could jeopardize sample stability and cause the entire extraction run to fail.  (Antes Decl. at ¶ 20).

In their capacity as Extraction Chemists, Plaintiffs also utilized their scientific judgment and made discretionary decisions during the "processing" step of the bioanalytical process.  After importing the chromatography data into the Analyst software system, they were required to (1) analyze whether the chromatography results to make sure that the run was completed and injected properly; (2) isolate and identify the particular chromatographic "peaks" that correspond to the pharmaceutical compound being analyzed and determine whether the peaks are properly shaped; and (3) filter out any extraneous "noise" that may be present in the chromatography by using their

scientific judgment, analysis and discretion to adjust the threshold and baseline parameters to ensure proper peak shapes for analysis.  (Antes Decl. at ¶ 16; Chakir Dep. at 83-84; Graham Dep. at 30-32; Harrison Dep. at 72; Kalis Dep. at 20-21; Nguyen Dep. at 40-41; Ofoma Dep. at 30).

Throughout the extraction process, Plaintiffs were required to use their troubleshooting and critical thinking skills, as well as their scientific knowledge and judgment, to determine whether the analysis is on track and in compliance with the SOP. (Antes Decl. at ¶ 19)  There were any number of situations that could have arisen unexpectedly during the extraction process (e.g., a sample spill, insufficient amount of solutions and reagents, unanticipated clouding of the samples, etc.) that would have required the Extraction Chemist to make a discretionary judgment about how best to document the circumstances and determine whether the extraction should continue or be aborted.  (Antes Decl. at ¶¶ 18-19; Graham Dep. at 85; Harrison Dep. at 50-53, 57-60, 64; Ofoma Dep. at 94-100; Reed Dep. at 49-50)  Plaintiffs also engaged in this troubleshooting and critical analytical activity whenever a particular extraction run failed to meet SOP acceptance criteria and thus provided unreliable data, because they had to work closely with the lab management team to determine where in the extraction process the error occurred.  (Antes Decl. at ¶ 19; Kalis Dep. at 53-55; Reed Dep. at 49-50)

Because Plaintiffs were constantly making important decisions and judgments that could make or break the outcome of a particular sample study, BA Research evaluated their performance on, among other things, their decision-making and problem solving abilities.  (Antes Decl. at ¶ 16; Graham Dep. at 84-86 & Ex. 11; Harrison Dep. at 144-46, 148, 151-52, 154, 156 & Exs. 9-15; Kalis Dep. at 53-55 & Ex. 10; Nguyen Dep.

- 18 -

at 89 & Ex. 5; Ofoma Dep. at 94-100 & Exs. 11-12; Reed Dep. at 94 & Ex. 12)  Indeed,

beginning in 2005, BA Research evaluated Plaintiffs in the area of "Problem Solving,

Decision Making and Creativity" by examining their ability to "develop well-reasoned

and sound strategies and solutions to problems," whether the chemists "maintain

objectivity, weigh risks, consider impacts, and exercise good judgment in decision

making," and whether the chemists are "innovative and creative in problem solving and

decision making."  (Antes Decl. at ¶ 16; Graham Dep. at 84-86 & Ex. 11; Harrison Dep.

at 154, 156 & Exs. 14-15; Kalis Dep. at 53-55 & Ex. 10; Nguyen Dep. at 89 & Ex. 5;

Ofoma Dep. at 94-100 & Exs. 11-12; Reed Dep. at 94 & Ex. 12).

BA Research's contention that Plaintiffs' work required "advanced knowledge" is

supported by the case law interpreting and applying the FLSA to chemists.  Though there

are only a handful of reported decisions analyzing the applicability of the professional

exemption to chemists or other employees holding science-based positions, those

decisions have uniformly held that such positions involved work requiring advanced

knowledge and thus qualified as exempt professionals.  *See Doherty v. Ctr. For Assisted

Reproduction, P.A.*, 108 F. Supp. 2d 672, 676-78 (N.D. Tex. 2000) (finding embryologist

was an exempt professional where she exercised discretion and judgment at each step in

the in-vitro fertilization process); *Henkin v. Forest Labs., Inc.*, No. 01 Civ. 4255(AKH),

2003 WL 749236, at *9 (S.D.N.Y. Mar. 5, 2003) (finding that plaintiff's work as a

chemist "certainly" met the criteria for the learned professional exemption); *Nairne v.

Manzo*, No. 86-0206, 1986 WL 12934, at *5-*6 (E.D. Pa. Nov. 14, 1986) (finding

ophthalmic technician was an exempt professional who consistently exercised discretion

and judgment where, among other things, she "performed a variety of tests, requiring the

use of highly sophisticated equipment, evaluated the data, and advised the doctor of the result"); *Molinari v. McNeil Pharmaceutical*, No. 84-5085, 1986 WL 5922, at *4-*5 (E.D. Pa. May 22, 1986) (finding chemist who "investigated and evaluated new syntheses for pharmaceutical products" was an exempt professional where, among other things, he made a number of scientific judgments while carrying out experiments).  Thus, the undisputed evidence regarding Plaintiffs' job duties as Extraction Chemists demonstrates that they performed work requiring advanced knowledge and therefore satisfied the first element of the primary duties test for the learned professional exemption.

        ii.    <u>Plaintiffs' "Advanced Knowledge" Was in a Field of Science or Learning" and Was Acquired Through Specialized Intellectual Instruction</u>

Plaintiffs' job duties also easily satisfied the second and third elements of the primary duties test.  Their advanced knowledge was in the field of chemistry, which the DOL's regulations specifically recognize as a "field of science or learning."  29 C.F.R. § 541.301(c); *see also* 29 C.F.R. § 541.301(d) (referring to the availability of the exemption for chemists).  Furthermore, BA Research specifically required that all Extraction Chemists have at least an undergraduate degree in chemistry or biology, and all of the Plaintiffs in fact have such a degree.  (Antes Decl. at ¶10; Chakir Dep. at 8-9; Graham Dep. at 10; Harrison Dep. at 11; Kalis Dep. at 6; Nguyen Dep. at 11; Ofoma Dep. at 8; Reed Dep. at 7-8)  Because such specialized academic training is a standard prerequisite for entrance into the Extraction Chemist position, Plaintiffs' duties without question met the third element of the primary duties test for the learned professional exemption.  *See* 29 C.F.R. § 541.301(d).

- 20 -

In sum, BA Research properly classified Plaintiffs as exempt learned professionals in their role as Extraction Chemists, and for this reason, their overtime claims under the FLSA fail as a matter of law and must be dismissed.

### 2. Plaintiff Harrison Was a Highly Compensated Exempt Employee

In addition to being an exempt professional, Plaintiff Harrison was also exempt from the FLSA's overtime requirements in 2007 and 2009 under the highly compensated employee exemption.  Under the DOL's FLSA regulations, "[a]n employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the [FLSA] if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee…." 29 C.F.R. § 541.601(a).

Harrison earned $104,380.52 from BA Research during 2007, and during the first three months of 2009 (through March 31, 2009), he earned $26,080.09.[8]  (Stoddart Decl. at ¶ 9; Harrison Dep. at 110 & Ex. 4)  Additionally, as discussed at length above, it is beyond dispute that, as an Extraction Chemist, Harrison customarily and regularly performed at least one of the duties of an exempt professional.  Thus, Harrison qualified

---

[8]      Even though Harrison did not work for BA Research for the entire year of 2009, he still qualified for the exemption for 2009 because the amount he earned during the time he was employed in 2009 exceeded $100,000 on a *pro rata* basis. *See* 29 C.F.R. § 541.601(b)(3); *In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910, 942 n.11 (D. Minn. 2010).  He was employed for 13 weeks in 2009, and his earnings of $26,080.09 would thus equate to annualized compensation of $104,320.36 (i.e., $26,080.09*(52 weeks/13 weeks)).  (Stoddart Decl. at ¶ 9; Harrison Dep. at 168 & Ex. 24)

as a highly compensated exempt employee in both 2007 and 2009,[9] and accordingly, his overtime claims with respect to these years should be dismissed on this basis alone.

C.     Plaintiffs' Overtime Claims Fail Because Plaintiffs Cannot Prove Any Damages as a Matter of Law

Even if the Court finds that Plaintiffs were not exempt from the FLSA's overtime requirements, their claims still fail because they have not suffered any damages. As explained below, Plaintiffs cannot meet their burden to prove that they worked uncompensated overtime, and even if they could meet that burden, their claims should still be dismissed because they were compensated more favorably than they would have been if they had been treated as non-exempt and paid overtime pursuant to the FLSA.

1.     Plaintiffs Cannot Prove any Damages, Even as a Matter of Just and Reasonable Inference

In order to prevail in an action for unpaid overtime under the FLSA, Plaintiffs must demonstrate that they performed uncompensated overtime work, as well as the amount and extent of such work. *Harvill v. Westward Communications, LLC*, 433 F.3d 428, 441 (5th Cir. 2005). The Supreme Court has articulated the following burden-shifting framework through which an FLSA plaintiff can meet this burden of proof:

> if [she] proves that [she] has in fact performed work for which [she] was improperly compensated and if [she] produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.

*Id.* (quoting *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)).

---

[9]     The fact that Harrison earned less than $100,000 in 2008 does not destroy the availability of the exemption for 2007 and 2009. *Coppage v. Bradshaw*, 665 F. Supp. 2d 1361, 1368-1369 (N.D. Ga. 2009) (finding that plaintiff's claims involved the years 2003 through 2006 but he was exempt as "highly compensated" only in 2004 and 2005).

Here, Plaintiffs cannot meet their burden to show the amount and extent of their alleged uncompensated overtime, even as a matter of just and reasonable inference. Indeed, Plaintiffs admit that they do not know how many hours they actually worked in any given week, and that their timesheets do not reflect the number of hours actually worked.  (Chakir Dep. at 57; Graham Dep. at 59-60, 62-63; Harrison Dep. at 79-80; Kalis Dep. at 31-32; Nguyen Dep. at 50-52, 58-59; Ofoma Dep. 56-57, 75-77; Reed Dep. at 65-66, 68, 102-03)  Plaintiffs also readily admit that they are not aware of any documents or other information that would allow them to determine how many hours they actually worked in a given workweek.  (Chakir Dep. at 110; Graham Dep. at 63; Harrison Dep. at 79-80; Kalis Dep. at 43-44; Nguyen Dep. at 58-59; Ofoma Dep. 75-77; Reed Dep. at 102-03)  Lacking any such information, Plaintiffs have simply resorted to making outrageous and speculative claims about the hours they allegedly worked each week and/or the amount of damages to which they believe they are entitled.  For example, Plaintiff Chakir provided several conclusory, and conflicting, estimates of how much he worked each week.  He first claimed that he worked 100 hours per week.  (Chakir Dep. at 104-05)  Later in his deposition he claimed that he worked 11 hours per day during the week and between six and eight hours per day on Saturday and Sundays.  (Chakir Dep. at 110)  Chakir further asserts that he is entitled to recover $235,000 in damages in this case, but admits that he has no methodology to offer in support of this figure.  (Chakir Dep. at 104)  Similarly, Plaintiff Harrison asserts that he worked 13 to 14 hours per day, seven days per week for BA Research, and that his claimed damages are $350,000.[10]  (Harrison Dep. at

---

[10]     A portion of Harrison's claimed damages is based on his unsupportable and self-serving assumption that he would have remained employed with BA Research and would not have resigned if the Company had paid him overtime, notwithstanding the fact that,

81, 171)  Plaintiff Nguyen claims that he worked 12 hours per day.  (Nguyen Dep. at 116)

He claims that he is entitled to $71,000 in damages, but he bases this figure not on any

records or estimates of his actual time worked, but rather on his time sheets, which he

admits do not allow him to determine how much he actually worked on any particular

day.[11]  (Nguyen Dep. at 50-52, 58-59, 111-13)

        This kind of vague and conclusory testimony has been rejected by numerous

courts, even under the lenient "just and reasonable inference" standard.  For example, in

*Bauer v. Singh*, No. 3:09-CV-194, 2010 WL 5088126 (S.D. Ohio Dec. 7, 2010), the court

refused to accept the plaintiff's conclusory estimate that he worked 83 hours each week

for a period of more than a year.  *Id.* at *14.  The court explained, "There is no indicia

whatsoever that [plaintiff] accounted for any variation from that schedule over that entire

year, such as vacation, personal days, holidays, sick days.  Without specific testimony

that [plaintiff] took any variations into account, or specific testimony that there were no

variations, the Court simply cannot accept such estimates as a matter of just and

reasonable inference."  *Id.*  Similarly, in *Barksdale v. E&M Transportation, Inc.*, No.

3:10cv140, 2010 WL 4451790 (E.D. Va. Nov. 1, 2010), the court found that sworn

---

only moments earlier in his deposition, Harrison testified that he could not state with
specificity why he resigned from BA Research.  (Harrison Dep. at 168-69, 171-73)

[11]     While perhaps less outrageous, the testimony from the other Plaintiffs is just as
speculative and is no more helpful in proving their alleged damages, even as a matter of
just and reasonable inference.  Plaintiffs Kalis and Reed have not attempted to calculate
their claimed damages.  (Kalis Dep. at 63; Reed Dep. at 101)  During the deposition of
Plaintiff Ofoma, his attorney asserted attorney-client privilege and instructed Ofoma not
to answer the Company's questions about his alleged damages, stating, "We'll just wait
for the initial disclosures."  (Ofoma Dep. at 104-05)  Notably, *none* of the Plaintiffs has
filed or served initial disclosures in this matter pursuant to Fed. R. Civ. P. 26(a)(1)(A),
and thus none has provided the computation of damages required by Fed. R. Civ. P.
26(a)(1)(A)(iii).

statements alleging between 50 and 80 hours per week, without any attempt to lay a foundation for actual hours worked (including failing to take into account time off for vacation or illness) were "general, conclusory statements that, even as a matter of just and reasonable inference, cannot sustain Plaintiffs' burden…." *Id.* at *3; s*ee also Harvill*, 433 F. 3d at 441 (affirming summary judgment for employer where plaintiff presented no evidence of the amount or extent of uncompensated overtime except a conclusory assertion that she worked 210 hours of overtime); *McLaughlin v. Murphy*, 436 F. Supp. 2d 732, 738 (D. Md. 2005) (granting summary judgment for defendant and finding employee did not meet his burden where his basis for calculating uncompensated hours was an interrogatory response stating his work week ranged from 40 to 55 hours); *Rose v. Digital Convergence.com Inc.*, No. 3:00CV2057X, 2001 WL 327843, at*2 (N.D. Tex. Mar. 30, 2001) (granting summary judgment for employer and rejecting plaintiff's affidavit assertion that she worked an average of 50 hours per week as a "mere averment" incapable of supporting her overtime claim); *Lee v. Vance Exec. Protection, Inc.*, 7 F. App'x. 160, 166 (4th Cir. 2001) (affirming summary judgment for defendant with respect to unrecorded hours and explaining, "There is much general testimony about [alleged uncompensated work], but the record is bereft of evidence showing the amount or extent of this extra work.").  Plaintiffs have thus failed to meet their burden to demonstrate the amount and extent of any alleged uncompensated overtime, even as a matter of just and reasonable inference, and their overtime claims should therefore be dismissed.

> 2. <u>Plaintiffs were Compensated More Favorably than They Would Have Been if They Had Been Treated as Non-Exempt</u>

Additionally, notwithstanding Plaintiffs' inability to prove any uncompensated overtime, the record does make clear that, under the compensation system that Plaintiffs

themselves played a role in creating, (Stoddart Decl. at ¶ 8; Harrison Dep. at 119-21; Nguyen Dep. at 66-67) and which they fought to keep when BA Research attempted to change the system,[12] they were compensated *more favorably* than if they had been treated as non-exempt employees and had been paid overtime compensation.  As a result, there are no damages to be recovered and their claims should be dismissed.

If Plaintiffs had been treated as salaried, non-exempt employees under the FLSA, they would have been entitled to overtime compensation for all hours worked over 40 in a workweek,[13] and they would have been required to keep clear time records.  Under their actual compensation system, however, they only tracked the number of runs they completed, not the actual number of hours they worked.  (Stoddart Decl. at ¶ 7; Chakir Dep. at 57; Graham Dep. at 59-60; Kalis Dep. 31-32; Ofoma Dep. at 56-57; Reed Dep. at 65-66)  Plaintiffs were paid a lump sum equivalent to four hours of straight time[14] for each extra run they completed, despite the fact that they were frequently able to work on multiple runs simultaneously.  (Stoddart Decl. at ¶ 6; Chakir Dep. at 27-28, 41; Graham

---

[12]    When BA Research attempted to change the premium compensation system by substituting compensatory time in lieu of additional pay for extra runs completed, most of the Plaintiffs opposed the proposed change and many refused to perform extra runs in exchange for comp time, and ultimately the system for paying premium pay for additional runs was left in place.  (Chakir Dep. at 69-72; Graham Dep. at 75; Harrison Dep. at 122; Kalis Dep. at 58-60; Nguyen Dep. at 74-75; Ofoma Dep. at 100-01; Reed Dep. at 89-90)

[13]    Such overtime compensation very likely would have been calculated using the Department of Labor's fluctuating workweek method, under which non-exempt employees who are paid a fixed salary for all hours worked may properly be paid half-time for hours worked over 40 in a week, rather than time-and-one-half.  *See* 29 C.F.R. § 778.114.

[14]    Although Plaintiffs were paid on a salary basis, BA Research calculated an hourly rate based on their base salary to use for compensating them for additional runs. (Stoddart Decl. at ¶ 6; Chakir Dep. at 28-29; Nguyen Dep. at 69)

Dep. at 76; Harrison Dep. at 64-65, 121; Kalis Dep. at 10, 24; Nguyen Dep. at 68, 90-91; Ofoma Dep. at 48-50, 91-92; Reed Dep. at 28, 57-58)  This compensation arrangement resulted in Plaintiffs receiving significantly more than time-and-a-half for hours worked beyond their normal 40-hour workweek.

For example, Plaintiff Harrison testified that when he recorded 28 hours on his time sheet for a particular day – meaning that he performed five extra runs that day on top of his regular workload – he actually worked around 13 hours to complete his work for that day.  (Harrison Dep. at 96-97)  Thus, after discounting the first eight hours as being covered by his salary, on such days he worked for five extra hours, but received a lump sum equivalent to 20 hours of extra pay.  Thus, he was effectively paid *quadruple* time for his extra hours beyond those already compensated by his salary.  Similarly, Harrison testified that on days when he recorded 16 hours on his time sheet, he actually only worked approximately eight hours to complete his work.  (Harrison Dep. at 104) Because his salary already compensated him for eight hours of work, on such days he received an additional lump sum equivalent to eight hours of pay without working any additional time beyond his normal eight-hour day.

Other Plaintiffs were similarly overcompensated for much of their extra work. Much like Harrison, Nguyen testified that when he recorded 28 hours on his time sheet, he actually worked between 10 and 15 hours to complete his work for that day.  (Nguyen Dep. at 52-53)  Therefore, after discounting the first eight hours which were covered by his salary, he received approximately quadruple time for his additional work on such days.  Likewise, Kalis testified that when she recorded 16 hours on her time sheet, she actually worked around 10 or 11 hours.  (Kalis Dep. at 36)  She similarly equated 20

- 27 -

recorded hours with approximately 12 actual hours worked.  (Kalis Dep. at 35)  Reed testified that when she recorded 20 hours, she likely actually worked around 16 hours or possibly less, and that when she recorded 24 hours, she actually worked about 16 hours. (Reed Dep. at 75-76, 79-80)  Thus, after discounting the first eight hours as covered by her salary, she received time-and-a-half for her extra hours worked on days when she recorded 20 hours, and on days when she recorded 24 hours, she effectively received double time for her extra hours.  Graham testified that when he recorded 28 hours, he would have actually worked between 16 and 20 hours to complete his work on such days, which means that he receive an amount of premium pay that was at least equivalent ot double time.  (Graham Dep. at 64)

In summary, Plaintiffs' testimony makes clear that they were extremely well compensated for the additional work that they performed beyond their normal 40-hour workweeks, and in many circumstances they were compensated better under the compensation system that was in place than they would have been under the FLSA's overtime system.  As a result, even if the Court cannot determine as a matter of law that Plaintiffs were exempt professionals not entitled to overtime under the FLSA, the Court should still dismiss their FLSA overtime claims because Plaintiffs have not suffered any recoverable damages.

D.     <u>Even if Plaintiffs' FLSA Overtime Claims Somehow Survive Summary Judgment, Such Claims Are Subject to a Two-Year Statute of Limitations Because Plaintiffs Cannot, as a Matter of Law, Demonstrate that BA Research Willfully Violated the FLSA</u>

Claims under the FLSA are generally subject to a two-year statute of limitations, unless the violation was "willful," in which case a three-year statute of limitations applies.  *Ikossi-Anastasiou v. Bd. of Supervisors of La. St. Univ.*, 579 F.3d 546, 552 (5th

- 28 -

Cir. 2009) (citing 29 U.S.C. § 255(a)).  An employer willfully violates the FLSA if it "'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'"  *Id.* (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  Importantly, the burden at all times rests on the Plaintiffs to prove such willfulness.  *Valcho v. Dallas County Hosp. Dist.*, 658 F. Supp. 2d 802, 807-08 (N.D. Tex. 2009) (citing *Cox v. Brookshire Grocery Co.,* 919 F.2d 354, 356 (5th Cir.1990)).

Here, there simply is no evidence in the record that BA Research knew or showed reckless disregard as to whether the classification of Plaintiffs as exempt professionals violated the FLSA.  Thus, Plaintiffs have failed to meet their burden to prove willfulness, and in the event that any of Plaintiffs' overtime claims survive summary judgment, the Court should find as a matter of law that a two-year statute of limitations applies to such claims.  *See Ikossi-Anastasiou*, 579 F.3d at 553 (finding that plaintiff's allegations of willfulness could not survive summary judgment where plaintiff provided no evidence that employer knew its pay practices violated the FLSA or that employer ignored or failed to investigate plaintiff's complaints); *Reyes v. Texas EZPAWN, L.P.*, 459 F. Supp. 2d 546, 565-66 (S.D. Tex. 2006) (granting summary judgment for employer on willfulness where plaintiffs failed to present any evidence of willfulness); *Edwards v. Alta Colleges, Inc.*, No. CIVASA03CA0538OG(NN), 2005 WL 578333, at *12-*13 (W.D. Tex. Jan. 28, 2005) (recommending summary judgment for employer on willfulness where plaintiff failed to raise genuine issue of material fact as to whether employer knew or should have known it was misclassifying its employees).

IV.    <u>CONCLUSION</u>

For the reasons discussed herein, BA Research requests that the Court grant the Company's Motion for Summary Judgment in its entirety and dismiss with prejudice all of Plaintiffs' claims for alleged unpaid overtime under the FLSA.  Should the Court not find as a matter of law that all Plaintiffs were exempt professionals, BA Research requests that the Court find as a matter of law that Plaintiff Harrison was properly exempt in calendar years 2007 and 2009 under the highly compensated employee exemption and dismiss with prejudice his FLSA overtime claim consistent with that finding (i.e., dismiss his overtime claim except as to calendar year 2008).  Additionally, should the Court not find as a matter of law that all Plaintiffs were exempt professionals, BA Research requests that the Court enter summary judgment in the Company's favor on the issue of willfulness and find, as a matter of law, that a two-year statute of limitations applies to any of Plaintiffs' claims that survive summary judgment.

Respectfully submitted this 6th day of May, 2011.

ALSTON & BIRD LLP

s/ Glenn G. Patton

Glenn G. Patton (admitted *pro hac vice*)
Attorney-In-Charge
Georgia Bar No. 567235
Brett E. Coburn (admitted *pro hac vice*)
Of Counsel
Georgia Bar No. 171094
1201 West Peachtree Street
Atlanta, Georgia  30309-3424
Tel. No. (404) 881-7000
Fax. No. (404) 881-7777
E-mail:glenn.patton@alston.com
         brett.coburn@alston.com

Alexandra Rose
Of Counsel
Texas Bar No. 24055698
2200 Ross Avenue, Suite 3601
Dallas, Texas  75201
Telephone:  (214) 922-3400
Facsimile:  (214) 922-3899
E-mail:alex.rose@alston.com

ATTORNEYS FOR DEFENDANTS

- 31 -

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 6, 2011, I electronically filed the foregoing *Memorandum of Law in Support of Defendant's Motion for Summary Judgment* with the Clerk of the Court in accordance with the Electronic Case Filing System of the United States District Court for the Southern District of Texas, which will automatically accomplish service through the Notice of Electronic Filing or other means on the following attorneys of record:

> Joseph Y. Ahmed
> Ahmad, Zavitsanos & Anaipakos, P.C.
> 3460 One Houston Center
> 1221 McKinney Street
> Houston, Texas 77010
>
> Howard T. Dulmage
> Law Offices of Howard T. Dulmage, PLLC
> 2323 Clear Lake City Blvd.
> Suite 180 MB 186
> Houston, Texas 77062

s/ Brett E. Coburn
Brett E. Coburn
